UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JO ANN BARNARD, | )<br>) Case No. 3:18-cv-537<br>)<br>) Judge Atchley<br>)<br>) Magistrate Judge Poplin<br>)<br>)<br>)<br>) |
| *Plaintiff*, | |
| v. | |
| POWELL VALLEY ELECTRIC COOPERATIVE, | |
| *Defendant*. | |

**MEMORANDUM OPINION AND ORDER**

Defendant Powell Valley Electric Cooperative ("PVEC") fired Plaintiff Jo Ann Barnard. Barnard sued PVEC claiming that it violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), by paying her less than her male coworkers throughout her career. She also claims that PVEC fired her because she engaged in legally protected activity—reporting her unequal pay and illegal activity by PVEC's directors. PVEC argues that it did not pay Barnard any less and that she was fired because she attempted to steal company records and threatened her supervisors.

Before the Court is Defendant's Motion for Summary Judgment. [Doc. 39]. For the following the reasons, Defendant's Motion for Summary Judgment [Doc. 39] is **GRANTED**. All of Barnard's claims are **DISMISSED WITH PREJUDICE**.

I.  BACKGROUND

In 1991, Barnard began working for PVEC. [Doc. 57 at 1]. PVEC is a private electric distribution cooperative in East Tennessee. [*Id.*] PVEC hired Barnard as the Director of Accounting and Finance. [*Id.* at 2]. Barnard reported to General Manager Randell Meyers, and at

all time relevant to this litigation, Meyers reported to President Roger Ball. [*Id.*]

Barnard's salary started at $ 19.13 per hour or approximately $ 40,000 a year. [Doc. 39-1 at 26–27]. Barnard was placed at step five of an M-13 pay grade under PVEC's wage plan. [Doc. 39-5 at 1]. She agrees that this placement was nondiscriminatory. Before 1993, she received two merit-based raises that elevated her to step seven of an M-13 pay grade. [*Id.* at 41]. Since, 1993 she has not received a merit-based pay raise, but she has received cost of living adjustments throughout her entire career. [Doc. 39-9].

Barnard claims that Meyers sexually harassed her throughout her career. [Doc. 57-1 at 2]. She also states that from 1991 to 1993, Meyers sexually assaulted her on multiple occasions. [*Id.* at 2–4]. She argues that PVEC has not raised her pay since 1993 because she did not have sex with Meyers. [*Id.*]

Barnard was part of the "core management" and executive teams at PVEC. [Doc. 40 at 2]. These teams also included Meyers and Director of Special Projects, Gary Hatfield. [*Id.*] When Barnard was terminated, three people at PVEC made more money than her: Meyers, Ronnie Williams, and Bo Goodin. [Doc. 40 at 3]. All of them were men. [*Id.*] Barnard's job objective as the Director of Accounting & Finance was "[t]o plan, organize, direct, coordinate, and control the total accounting and financial functions of [PVEC]." [Doc. 39-7 at 1]. Williams was an area supervisor, and the objective of his job was to "supervis[e] and coordinat[e] all activities to the construction, operations, and maintenance of [PVEC]'s electrical system within the Tazewell district, which serves approximately one half of [PVEC]'s members." [Doc. 39-8 at 1]. Goodin was Assistant General Manager, and Barnard stated that she did not know what Goodin did on a day-to-day basis. [Doc. 39-1 at 191, 203]. She also did not know Goodin's background. [*Id.* at 165–66].

In August of 2016, PVEC underwent its annual audit. [Doc. 57 at 3–5]. At the time, Barnard discovered news articles about a scandal involving Bristol Virginia Utility. [*Id.*] She believed that the news from Virginia Utility echoed some of the practices at PVEC. Specifically, she identified issues such as self-dealing by managers, improper tax treatment of company vehicles, and the continuation of a more expensive electric contract with the Tennessee Valley Authority ("TVA") due to personal connections that Meyers had with an employee at TVA. [*Id.*] While Barnard raised the concerns to the external auditor, the auditor did not report them. [Doc. 57-1 at 4–5]. Barnard believes that the auditor did not do so because of his personal relationship with Meyers. [*Id.*] She decided she would raise those issues directly.

On November 8, 2016, Barnard requested a raise. [Doc. 39-11 at 1]. On November 11, Barnard met with Meyers and secretly recorded the conversation. [Doc. 39-18]. The conversation was wide ranging: she covered what she believed to be the various offenses committed by PVEC and briefly raised the issue of her own salary. [*Id.* at 9–28].

On November 28, Barnard asked to testify in front of the Audit Committee. In preparation of her testimony, she sent several documents to the committee members. [Doc. 38-2 at 1]. The first document, "Summary of Questionable Decisions," raised concerns about the legality of PVEC's conduct. [*Id.* at 3–9]. She attached articles about Virginia Utility's wrongdoing. [*Id.* at 10–15]. She also included a seven-page letter that detailed Meyer's history of sexual harassment as well as complaints about pay raises. [*Id.* at 16–22].

Focusing on the letter, it began with a detailed explanation of the alleged sexual assault and sexual harassment. [*Id.*] Barnard then shifted to statements about her income. She stated that she had not received a merit pay raise since 1993. [*Id.* at 18]. She pointed out that her staff had not been given raises, and all but one her staff were women. [*Id.*] She compared that to people outside

her department who had received raises; all but one of them were men. [*Id.*] Finally, she claimed she asked for a raise because she "was ***fed up with discrimination***." [*Id.* at 20] (emphasis in original). Several officers, including Ball, stated that they understood that Barnard was complaining about the pay disparity between men and women. [Doc. 38-1 at 109; Doc. 38-3 at 45–47].

The Board of Directors immediately moved to place Barnard on administrative leave. [Doc. 40 at 4]. On December 2, she sent another email to PVEC with a more detailed explanation of Meyers's behavior and a comparison of Barnard's pay to other, male employees. [Doc. 57-5]. On December 9, PVEC's counsel called Barnard to discuss possible settlement of her complaint. [Doc. 60-2 at 14]. PVEC and Barnard had several discussions before PVEC terminated her employment. [Doc. 57 at 13–15]. In these discussions, PVEC's counsel stated that early retirement could be an option, and they also stated that they believed Barnard had a poor relationship with her employees. [Doc. 57-1 at 11–13]. During her suspension, Barnard hired an attorney and threatened suit. [Doc. 57 at 13; Doc. 60-15 at 5].

On December 28, 2016, Barnard and her then husband went to Lisa Tarver's house. [Doc. 39-28 at 58]. Tarver was an employee in the Accounting and Finance Department with Barnard. The exact topic of conversation is a matter of dispute between the parties. Tarver testifies that Barnard barged in and immediately started venting her frustrations about PVEC. [*Id.* at 60]. Tarver stated that Barnard said she wanted to get a gun and shoot her supervisors. [*Id.* at 61]. Tarver also states that Barnard handed her a flash drive. [Doc. 39-29 at 3]. Barnard wanted documents from PVEC's computers including "all communications with TVA and all retail and wholesale rate data." [*Id.* at 3]. Tarver was supposed to copy those documents and then give them to Barnard's then husband at a post office the next day. [Doc. 39-28 at 71–72]. Tarver agreed to do so "just so

[she] could get [Barnard] out of her house." [Doc. 39-29 at 4].

Barnard agrees that she gave Tarver a flash drive. [Doc. 57-1 at 14–15]. Barnard claims that she was working at home during the suspension and wanted the TVA retail rates file, but she also states that the TVA rates were public information. [*Id.*] Barnard states that she never said anything about weapons or trying to take down PVEC. Barnard's then husband also does not remember any conversation about weapons. [Doc. 57-9]. Barnard claims that Tarver told her that PVEC was like a prison. [Doc. 57-1 at 14–15]. And Barnard further alleges that management had warned Tarver that her job was at stake if she assisted Barnard in any way. [*Id.*] Barnard argues that her supervisors concocted the conversation about guns as a pretext for firing her due to her complaint about discrimination and criminal wrongdoing. [Doc. 57 at 21].

Barnard's supervisors discovered that she went to Tarver's house. [Doc. 39-29 at 5]. Originally, PVEC claimed that Barnard was fired during an executive meeting of the Board of Directors. [Doc. 38-8 at 6–7]. However, PVEC amended its original response and stated that Ball learned of Barnard's conduct, consulted with executive members, "obtained consensus for termination," and approved the termination letter. [Doc. 57-7 at 4].

Barnard was officially terminated on January 6, 2017. [Doc. 39-26]. The termination letter started by stating that PVEC had discovered issues with her employment when investigating her complaint. [*Id.*] Then the letter specifically identified the interaction with the Tarver as the reason motivating termination:

> Such Conduct includes among other issues, (i) pressuring PVEC employees to sneak copies of PVEC's confidential business records to you for your own personal use, (ii) pressuring one of your subordinate employees to copy records after being told by the employee it would violate company directives to do so, (iii) asserting your desire to "take down" the cooperative.
>
> You also stated to your subordinate employee that you have considered shooting me, the Board Chairman, and other PVEC employees.

5

[*Id.*]¹

Barnard continued to contact her supervisors at PVEC. [*See generally* Doc. 55]. Of particular relevance here is Barnard's interaction with Ball on March 13, 2017. [Doc. 60-1]. Barnard and her father confronted Ball in the PVEC parking lot after work while it was raining. [*Id.* at 1]. Barnard parked her car behind Ball's car so that he could not leave. [*Id.*] At the time, Barnard was seeking reinstatement of her position at PVEC. [Doc. 55, 3.17.2017 Ball Conversation Recording at 0:00–0:10]. There are two discussions that Barnard argues are probative here:

> **Barnard**: I've done a lot at WaFloy, [a Christian camp where Barnard worked], but I've got my one-time stuff done there. And my heart and soul is with Powell Valley, I don't want to cause them any harm and whoever said that I was trying to take it down was lying.
>
> **Ball**: Well, I never heard any of that. But you know . . . the biggest thing I know is all the stuff that you've handed me.
>
> . . .
>
> **Barnard**: Roger, why do they not want me back at Powell Valley because I've busted my butt for Powell Valley for 25 years and I am within 7 months where I could actually go out and retire and get medical insurance. . . . I don't know why he's doing me this way and much as I've done for Powell Valley.
>
> **Ball**: Well, has your Daddy ever read all you wrote?
>
> **Barnard**: He's read part of it.
>
> **Ball**: Well, that writing is what, in my opinion, was . . . [interrupted by Barnard's father].

[Doc. 57-1 at 18; Doc. 55, 3.17.2017 Ball Conversation Recording at 1:40–2:10; 3:10–3:33]. Barnard argues that this conversation demonstrates that Ball fired her because of her complaint and that Ball did not even know of the previous conversation with Tarver. [Doc. 57 at 18–19].

---

¹ Barnard argues that PVEC actually made the decision to terminate her much earlier. [Doc. 57 at 11].

Barnard sued PVEC claiming that: (1) her unequal pay violated the Equal Pay Act and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-301 *et seq.*, and (2) her termination was illegal retaliation under the Equal Pay Act, the THRA, and the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304. [Doc. 1]. Defendant moved for summary judgment arguing that: (1) Barnard cannot prove that she was paid differently for equal work; (2) she did not raise a complaint sufficient to trigger the retaliation provisions of the relevant statutes; (3) and it had a valid, nondiscriminatory reason to terminate Barnard. [Doc. 39].

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court may not weigh the evidence; it must determine if a reasonable jury, based on the evidence in the record, could find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough. *Id.* at 251–52. If a reasonable juror could find for the nonmovant, the Court must deny summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. APPLICATION

### A. Barnard's Claims of Wage Discrimination

The Equal Pay Act provides that an employer cannot discriminate on the basis of sex by paying lower wages when an employee performs "equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working

7

Case 3:18-cv-00537-CEA-DCP   Document 66   Filed 04/12/21   Page 7 of 19   PageID #: 1802

conditions." 29 U.S.C. § 206(d)(1). While the jobs need not be identical, they must be substantially similar. *Beck-Wilson v. Principi*, 441 F.3d 353, 359–60 (6th Cir. 2005). If the plaintiff meets the prima facie case by proving she was paid less for equal work, the burden shifts to the defendant to prove that the unequal pay is the result one of the four affirmative defenses set forth in the Equal Pay Act. *Id.* at 360. If the defendant proves an affirmative defense, the burden shifts back to the plaintiff to prove pretext. *Id.*

To show the prima facie case, the plaintiff must present a "comparator," a member of the opposite sex who receives more pay for equal work. *Id.* at 359. To determine if such work is equal, courts often require a showing of fungibility: *i.e.* do employers treat these positions as interchangeable. *See, e.g., Wilson v. Wilkie*, 2:18-cv-515, 2020 WL 2128613, at *6 (S.D. Ohio May 5, 2020) (collecting cases). Yet even when positions are interchangeable, they may not be equal. *Galligan v. Detroit Free Press*, 436 F. Supp. 3d 980, 995–96 (E.D. Mich. 2020). This inquiry cannot be conducted "at a high level of abstraction." *Spencer v. Va. State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019). Instead, the Court must examine jobs on a case-by-case basis. *Beck-Wilson*, 441 F.3d at 359.

Barnard attempts to compare her position to Williams's and Goodin's work. Barnard argues that their positions were equal because: (1) they were all management; (2) they all prepared "construction work plans, ten-year forecasts, annual budgets, develop[ed] and update[ed] PVEC's policies and procedures, evaluat[ed] job costs and service costs, and sure [sic] that all of the foregoing were implemented;" and (3) all prepared reports for the Board of Directors and other power associations, like TVA. [Doc. 57 at 25]. Yet, these similarities are not sufficient to prove Barnard's prima facie case.

First, the fact that they were all management is not helpful in determining whether their jobs were equal. Titles provide little help in this inquiry. *See Wheatley v. Wicomico Cnty. Md.*, 390 F.3d 328, 332 (4th Cir. 2004) ("We decline to accept the argument . . . that employees with the same titles and only the most general similar responsibilities must be considered 'equal' under the [Equal Pay Act].") Second, Barnard's argument that all parties had to delegate functions, discipline employees, and approve vacation time is too general. *See Galligan*, 436 F. Supp. 3d at 995–96. Any manager, from the manager of a local fast-food restaurant to the CEO of a Fortune 500 company, has to delegate functions and discipline employees. That truism does not help the Court determine if the jobs are equal. *See Spencer*, 919 F.3d at 204 (noting skills professor identified such as "studying, preparing, presenting, [and] discussing" were "tasks and skills shared by middle-school teachers and law-school professors" and "impermissibly general.")

Furthermore, the assertion that all of them had to prepare reports is unpersuasive because the mere requirement that an individual has to write something is too vague. For example, in *Galligan*, the court examined if all newspaper reporters had equal jobs. 436 F. Supp. 3d at 995–96. All of the reporters wrote news articles, but the court still held that their jobs were not equal because the writers focused on different topics and had different "core competencies." *Id. Galligan* is persuasive here because it may be that everyone in management at PVEC prepared reports, but their reports were not on the same topics. They would presumably focus on the department that each individual leads. Thus, it does not demonstrate that the jobs were equal.

Because the generalities provided by Barnard are not helpful in this inquiry, the Court will examine the specific duties of each job. Barnard supports her conclusions about Goodin's position using her own affidavit. [Doc. 57 at 24–25]. Yet, in previous depositions, Barnard demonstrated that she knew almost nothing about Goodin's day-to-day activities or background. For example,

Barnard admitted that she did not know "his background and experience of working with equipment for an electrical distribution system." [Doc. 39-1 at 165–66]. She agreed that she does not "have detailed knowledge about what the assistant general manager does." [*Id.* at 191]. Barnard also stated, "I don't know what [Goodin] does at work." [*Id.* at 203]. Her unfounded assertions in her affidavit do not correct this deficiency or create a genuine issue of material fact. *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony.")[2] Barnard has not provided any evidence of Goodin's job, and therefore the Court cannot hold that she has met her prima facie case as to Goodin.

Finally, the job descriptions provided demonstrate that Barnard and Williams do not work equal jobs. Williams's job has several requirements that Barnard's does not: including, but not limited to, "maintain[ing] the highest level of knowledge concerning all aspects of electric utility construction, operations and maintenance" and "possess[ing] knowledge and expertise in the National Electric Safety Code (NESC) [and] Occupational Safety and Health Administration (OSHA) regulations." [Doc. 39-8 at 2]. Furthermore, the working conditions are not similar. Williams had to "perform[] duties under adverse weather conditions," work "irregular hours . . . including nights, weekends, and holidays," and have the "ability to respond on a 24/7 basis." [*Id.* at 3]. Barnard did not. [*See* Doc. 39-7]. Furthermore, Barnard has produced no evidence that she ever assumed any duty from Williams's job which demonstrates that management did not consider these jobs to be fungible. Because Williams's job is not equal, Barnard has not presented a usable comparator.

---

[2] Barnard responds that "Defendant has failed to properly assert its assertion that Plaintiff's job duties were unequal to her proposed comparators with any competent proof." [Doc. 57 at 25]. But Barnard, not PVEC, bears the burden of production. *Beck-Wilson*, 441 F.3d at 360.

Barnard makes one final argument. She argues other employees received more raises than she did. [Doc. 57 at 26]. But the Equal Pay Act's text limits it to comparisons of the amount of salary. 29 U.S.C. § 206(d)(1). The act makes it illegal for an employer to pay one sex "at a rate less than the rate at which" it pays the other sex. *Id.* That language limits the Court to an examination of total salary, not wage growth. This conclusion is bolstered because Barnard cites no cases, and the Court is aware of none, where the Equal Pay Act was applied when an individual had not received a raise because of sexual discrimination. Because Barnard cannot prove that she was paid less for equal work, Defendant's Motion for Summary Judgment [Doc. 39] is **GRANTED** as to Barnard's Equal Pay Act Claim. Barnard's claim for unequal wages under the Equal Pay Act is **DISMISSED WITH PREJUDICE**.

Barnard alleges the THRA claim on the basis of the same facts. [Doc. 1 at 8–9]. Therefore, the standards that apply in the Equal Pay Act claim apply in the THRA claim. *Payne v. Goodman Mfg. Co., L.P.*, 726 F. Supp. 2d 891, 909–10 (E.D. Tenn. 2010). The Court has already determined that she has failed to present her prima facie case. Because she cannot prove she was paid less for equal work, her THRA claim must also fail. *Id.* Therefore, Defendant's Motion for Summary Judgment [Doc. 39] is **GRANTED** as to Barnard's THRA claim. Her claim for unequal wages under the THRA is **DISMISSED WITH PREJUDICE.**

### B. Barnard's Claims of Retaliation

When analyzing a claim of retaliation under the Equal Pay Act, courts adopt the framework associated with the more familiar civil rights statutes, such as Title VII. *EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 500–01 (6th Cir. 2006). Therefore, the analysis follows the familiar *McDonald-Douglas* balancing framework. *Mickey v. Zeidler Tool & Die Corp.*, 516 F.3d 516, 523 (6th Cir. 2006). The plaintiff bears the initial burden of showing the prima facie case. *Id.* Upon

establishing the prima facie case, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment action. *Id.* If the defendant provides a non-discriminatory reason, the burden then shifts back to the plaintiff to establish pretext. *Id.* The THRA and the TPPA also follow the *McConnell-Douglas* framework. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996); *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 870 (E.D. Tenn. 2013).

To show the prima facie case for retaliation, Barnard must present evidence that: (1) she engaged in protected activity; (2) PVEC knew of the protected activity; (3) PVEC took an adverse employment action; and (4) there is a causal connection between the protected action and the adverse employment action. *Sundance Rehab.*, 466 F.3d at 501. PVEC challenges only the first element of the prima facie case—that Barnard engaged in protected activity. [Doc. 40 at 17].

It argues that Barnard's presentation to the audit committee was too vague to qualify as protected activity. [*Id.*] While a complaint must be more than a "vague charge of discrimination," *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (quoting *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)), an informal assertion of an individual's rights can be sufficient to constitute a protected activity. *Ennis v. Tennessee*, 835 F. App'x 811, 821 (6th Cir. 2020). The central question is whether a plaintiff's employer "should have reasonably understood that [she] was making a complaint of sex discrimination." *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112 (6th Cir. 2018) (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016)) (alteration in original).

Barnard's complaints to PVEC clear this hurdle. Barnard's seven-page letter detailed how her employees—who were almost all women—had not received pay raises when compared to other employees—who were almost all men—in the company. [Doc. 38-2 at 18]. She placed this in a complaint which detailed a long history of sexual harassment. [*Id.* at 16–22]. She wrote that

she was "***tired of discrimination.***" [*Id.* at 20] (emphasis in original). Furthermore, Ball and another member of the Board testified that they understood her complaint encompassed sex-based wage discrimination. [Doc. 38-1 at 109; Doc. 38-3 at 45–47]. Thus, a reasonable jury could find that Barnard engaged in protected activity.

PVEC also attempts to argue that Barnard's complaint is not protected activity because it is part of her job. [Doc. 40 at 17]. That argument is similarly unavailing. A protected activity must be adverse to the relevant company's interest. *Claudi-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004) (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)). PVEC argues that this case is similar to *Robinson v. Walmart Stores, Inc.*, 341 F. Supp. 2d 759, 763 (W.D. Mich. 2004) because Barnard, as head of a department, was acting within her employment when she complained about her employees' pay. But in *Robinson*, the relevant employee was in human resources, and she had raised the illegal activity in an attempt to reveal— and hopefully minimize—any liability for the company. *Id.* at 763. Thus, the complaint was not sufficiently adversarial to qualify as protected activity. In this case, it was sufficiently clear that Barnard's request was adversarial. She asked for a pay raise for herself. [Doc. 39-11 at 1]. Before she was fired, she hired an attorney and told PVEC's counsel, on multiple occasions, that she was considering a lawsuit. [Doc. 57 at 13; Doc. 60-15 at 5]. Because Barnard's complaint was sufficiently adversarial, she has met her burden on proving the prima facie case.

The burden then shifts to PVEC, and it responds that it had several nondiscriminatory reasons which will support Barnard's termination. It fired her because she attempted to steal records and threatened her supervisors. [Doc. 39-21]. These reasons are clearly nondiscriminatory reasons which would support Barnard's termination. Thus, the burden shifts back to Barnard to present evidence that these reasons were pretextual. *Mickey*, 516 F.3d at 523.

A plaintiff can prove pretext if she demonstrates "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate [the plaintiff's] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*abrogated on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)) (internal quotation marks and emphasis omitted); *See also Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (relying on same factors). For the first factor, the plaintiff can demonstrate that the underlying reason is factually false. *See Manzer*, 29 F.3d at 1084. The third factor requires the plaintiff to identify a member who did not engage in protected activity and who was not fired for the same misbehavior that the employer identifies as the motivation behind termination. *Id.* The second factor is broader: It allows "the plaintiff [to] argue[] that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is [pretextual]." *Id.*

When an employer gives multiple independent reasons for termination, an employee must demonstrate that all the reasons were pretextual to survive summary judgment. *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 478 (6th Cir. 2012); *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir. 1987). There is one "narrow" exception to this rule. *Jones*, 504 F. App'x at 478. Occasionally, "the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment" even if only one of the reasons is pretextual. *Smith v. Chrysler Corp.*, 155 F.3d 799. 809 (6th Cir. 1998) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995)).

Barnard first argues that she never made any threats towards her supervisors. [Doc. 57-1 at 15; Doc. 57-9]. PVEC responds that: (1) Tarver has repeatedly affirmed that she is telling the truth and (2) it does not prevent PVEC from relying on "honest belief" rule. [Doc. 60 at 7–10]. But the Court does not need to rely on the "honest belief" rule. Even if the Court assumes that the accusation of potential violence was pretextual, PVEC would still be entitled to summary judgment.

PVEC's reason that Barnard tried to take records from PVEC is a valid non-discriminatory reason to fire Barnard. While this arises out of the same conversation with Tarver, it is sufficiently independent from PVEC's concerns about violence. The document-based rationale does not rely on any alleged threat. Second, even if the violence-based rationale is pretextual, it does not raise suspicion about whether Barnard attempted to take documents from PVEC: She admits that she did. [Doc. 57-1 at 15–16].

Thus, Barnard has to produce other evidence that PVEC's reason regarding the documents is pretextual. She argues that it is pretextual because (1) PVEC had already decided it was going to fire her; (2) PVEC has been inconsistent in explaining how it came to this decision; (3) she was just using the records to work at home; and (4) Ball changed his rationale as to why he fired Barnard. [Doc. 57 at 12–23]. The Court will address each argument in turn.

Barnard's first argument is unpersuasive. While PVEC's attorneys and Barnard engaged in several discussions where PVEC sought to settle her complaint, Barnard was only suspended at the time. The letter provided by PVEC explained why it decided to terminate her employment on that day. The previous discussions, where the attorneys mentioned other possible reasons why Barnard could not return, did not contradict the final decision made by Ball. If anything, the discussions provide additional nondiscriminatory reasons to terminate Barnard (such as her

relationship with her coworkers) because the termination letter references these issues. [Doc. 57-1 at 12–13; Doc. 39-21].

Barnard's claim about the inconsistent explanation of how PVEC reached its decision also does not demonstrate pretext. In PVEC's first response to interrogatories, it stated that the decision was reached by an executive meeting of the Board, but in its second response PVEC stated that Ball learned of Barnard's conduct, consulted with executive members, "obtained consensus for termination," and approved the termination letter. [Doc. 38-8 at 6–7; Doc. 57-7 at 4]. Barnard fails to explain how PVEC changing its description of the procedure used would bring into question the ultimate reason for termination. Barnard has to produce evidence that demonstrates that she was terminated because she engaged in protected activity. *Tex. Dep't. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) A slight inconsistency in how a decision was reached does not provide evidence of that fact, so it is not helpful here.

Third, Barnard claims that PVEC consented to her having the files for work at home, but PVEC never gave Barnard the option to work from home. At the time she requested her files, she was suspended. She had hired an attorney and was in discussion with PVEC's attorneys. Furthermore, Barnard claims that PVEC's counsel consented to her taking the documents on December 19, 2016. [Doc. 39-28]. Yet in that conversation she merely mentioned working from home and having someone from PVEC send her documents. [Doc. 55, 12.19.2016 Meeting with Britt Smith and David Stanifer Recording at 2:27:55–2:28:15]. Counsel never consented to her having the files. In fact, she stated someone could be in the room to ensure that she never said, "Mike send me all my files." [*Id.*] Thus, the conversation is inapposite: it is actually clear Barnard understood that PVEC did not want her to access the documents. Therefore, no reasonable juror could find that PVEC consented to Barnard taking the documents.

Finally, Barnard argues that when she confronted Ball, he shifted his rationale for firing her.[3] Context is important here. Barnard started the conversation by asking for her job back. [*Id.*, 3.17.2017 Ball Conversation Recording at 0:00–0:10]. She confronted Ball, in a parking lot, at night, while it was raining, with her father in tow. [Doc. 60-1 at 1]. Not only does the context diminish the statement's probative value, it shows that Ball was explaining why she could not get her job back after termination.

Furthermore, his explanation—even if it was regarding Barnard's termination—does not contradict the termination letter. The letter states that "[w]hile investigating your concerns during you paid leave of absence, PVEC's attention is also inevitably drawn to the nature of your own conduct at work . . ..." [Doc. 39-21]. So Ball mentioning the reports did not contradict the reasons given in the letter. In fact, it is consistent with the idea that PVEC discovered concerns as to Barnard's work when investigating her complaint. Because Ball's statement does not contradict

---

[3] Barnard relies on these two specific exchanges:

> **Barnard**: I've done a lot at WaFloy, [a Christian camp where Barnard worked], but I've got my one-time stuff done there. And my heart and soul is with Powell Valley, I don't want to cause them any harm and whoever said that I was trying to take it down was lying.
>
> **Ball**: Well, I never heard any of that. But you know . . . the biggest thing I know is all the stuff that you've handed me.
>
> . . .
>
> **Barnard**: Roger, why do they not want me back at Powell Valley because I've busted my butt for Powell Valley for 25 years and I am within seven months where I could actually go out and retire and get medical insurance . . . I don't know why he's doing me this way and much as I've done for Powell Valley.
>
> **Ball**: Well, has your Daddy ever read all you wrote?
>
> **Barnard**: He's read part of it.
>
> **Ball**: Well, that writing is what, in my opinion, was . . . [interrupted by Barnard's father].

[Doc. 57-1 at 18; Doc. 55, 3.17.2017 Ball Conversation Recording at 1:40–2:10; 3:10–3:33].

the given reason, it is not sufficient evidence to find pretext. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020) (noting conflict is a touchstone of shifting rationale and pretext analysis and stating "[c]onflict inherently involves multiple elements in opposition").

Furthermore, in cases where the Sixth Circuit holds that a defendant's shifted rationale is sufficient for a finding of pretext, there is a significant departure from the previously stated reason. For example, in *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996), the court found that the employers shifting rationale was sufficient evidence of pretext when the employer added that plaintiff had lackluster job performance. *Id.* Yet the employer in that case listed the employee's performance as a potential concern only after litigation commenced. *Id.*[4] Similarly in *Eades v. Brookdale Senior Living, Inc.*, 401 F. App'x 8, 12 (6th Cir. 2010), the employer specifically proclaimed that the employee was fired due to his "failure . . . to meet the most basic element of his job according to his resume and job duties." Yet, on appeal, the employer stated that his termination was unrelated to performance: A position that contradicted the employer's argument in district court. *Id.* Thus when rationales shift significantly, they can be enough on their own to establish pretext. But a slight, noncontradictory departure is not sufficient to establish pretext.[5]

In short, Ball's half-completed thought is not sufficient to overcome the nondiscriminatory reason provided by PVEC. And even if Ball's statements provided some evidence of pretext, "summary judgment is appropriate . . . if the plaintiff 'only created a weak issue of fact as to

---

[4] The Sixth Circuit has also stated that generally shifting rationales are relevant if the "employer's proffered reason for termination changed after litigation commenced." *Williams v. AT&T Mobility Servs. LLC.*, 847 F.3d 384, 397 (6th Cir. 2017). PVEC has not changed its position during litigation.

[5] Furthermore, no reasonable juror could find that Ball's statement "[w]ell, I never heard any of that" meant that he had not heard of Tarver and Barnard's interaction. Especially because Barnard argues that Ball was the driving force behind the firing and drafted the termination letter. [Doc. 57 at 19–21]. While Barnard is entitled to every reasonable inference that can be drawn by the evidence, the inference suggested by Barnard is not reasonable. *Matsushita Elec.*, 475 U.S. at 587. "I never heard any of that" could easily refer to the several other topics Barnard mentioned.

18
Case 3:18-cv-00537-CEA-DCP   Document 66   Filed 04/12/21   Page 18 of 19   PageID #: 1813

whether defendant's reason was untrue' and there is ample evidence to support the employer's position." *Abdulnour v. Campbell Soup Supply Co., LLC,* 502 F.3d 496, 504 (6th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)). *See also Eades*, 401 F. App'x at 13 ("[W]e look not only to whether changes in the employer's rationale have occurred, but to whether the circumstances could permit a rational factfinder to conclude that these changes are indicative that the currently-proffered explanation is false.").

Barnard has not produced enough evidence to raise a genuine issue of material fact on her retaliation claims. Barnard admitted that she attempted to take documents from PVEC. She admitted that she sent one of her employees to do so. And she admitted that PVEC did not want her to have these documents. There is ample evidence which supports PVEC's decision and none that supports Barnard's theories, so she has not produced sufficient evidence which would allow a reasonable jury to find for her. *See Abdulnour*, 502 F.3d at 504. Because she fails to rebut the reasons offered by PVEC, all of her claims for retaliation under the Equal Pay Act, THRA, and TPPP fail. *Mickey*, 516 F.3d at 523; *Campbell*, 919 S.W.2d at 31; *Levan* 984 F. Supp. 2d at 870.

Therefore, Defendant's Motion for Summary Judgment [Doc. 39] is **GRANTED** as to Barnard's retaliation claims. All of Barnard's claims for retaliation are **DISMISSED WITH PREJUDICE**.

IV. **CONCLUSION**

For the reasons stated, Defendant's Motion for Summary Judgment [Doc. 39] is **GRANTED**. All of Barnard's claims are **DISMISSED WITH PREJUDICE**.

SO ORDERED.

/s/ *Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**